## Appeal of The Fidelity Insurance Trust and Safe Deposit Company.

A testatrix bequeathed to A "eighty-one shares of Provident Life and Trust Company of Philadelphia *now* standing in my name on the books of said company." The will was executed February 21st, 1881, when

the testator owned eighty-one shares of the stock mentioned. In February, 1882, the Provident &c. Company increased their capital from $500,000 to $1,000,000, and also increased the par value of their stock from $50 to $100, giving to their stockholders the option to subscribe before December 15th, 1883, at par for an amount equal to their holdings. The testator accepted this privilege, surrendered her certificate for 81 shares, received a new certificate for 41 shares of the new par value, paying $50 cash for the extra half share, and on June 2d, 1882 paid for the amount of her new subscription, which by its terms was to draw interest until December 15th, 1883, when new certificates were to be issued. Before that time, on August 13th, 1883, the testatrix died having made no change in her will. The Act of June 4th, 1879, (P. L., 88, sec. 1) provides "Every will shall be construed with reference to the real estate and personal estate comprised in it, to speak and take effect as if it had been executed immediately before the death of the testator, unless a contrary intention shall appear by the will."

*Held*, under the foregoing Act, that the contrary intention sufficiently appeared; that the will should speak from the date of its execution, and that the legacy therein bequeathed was of 81 shares as they then existed, and not of the 81 shares of which the testatrix died possessed.

January 26th, 1885. Before Mercur, C. J., Gordon, Paxson, Trunkey, Sterrett, Green and Clark, JJ.

Appeal from the Orphans' Court of *Philadelphia County*: Of July Term, 1884, No. 39.

Appeal of The Fidelity Insurance Trust and Safe Deposit Company, trustees for Joseph Ruths under the will of Julianna B. Carman, deceased, from the decree of the Orphans' Court making distribution of the estate of said Julianna B. Carman, deceased.

At the audit of the account of Harriet M. Severns, executrix, before Penrose, J., the following facts appeared: Julianna B. Carman died August 18th, 1883, leaving a will in which she provided *inter alia* as follows: "I also give and bequeath eighty-one shares of the Provident Life and Trust Company of Philadelphia, now standing in my name on the books of said company, to The Fidelity Insurance Trust and Safe Deposit Company of Philadelphia, in trust, to collect and receive the interest or dividends arising from the aforesaid eighty-one shares of the Provident Life and Trust Company, when due and payable, and apply the same to the support and maintenance of my grandson, Joseph Ruths, of Philadelphia, for and during the term of his natural life; and from and after the death of my said grandson, Joseph Ruths, in further trust to assign and transfer the aforesaid eighty-one shares of the Provident Life and Trust Company of Philadelphia, to my sister Harriet M. Severns, formerly Harriet M. Williams, of Philadelphia, her heirs and assigns forever."

By a subsequent clause the executrix was made residuary legatee.

The will was executed February 21st, 1881, and the Provi-

dent Life and Trust Company stock then standing in the name of the testatrix were eighty-one shares of the par value of $50 per share. Afterwards in February, 1882, The Provident Life and Trust Company increased the par value of its stock from $50 to $100, issuing for this purpose new shares of the increased value in lieu of the old stock, at the rate of one new share for two old shares. Under this arrangement the testatrix surrendered her certificate for eighty-one shares of the par value of $50 each, and received in exchange a certificate for forty-one shares of the par value of $100, the additional one half share being paid for in cash.

At the same meeting of the stockholders of the Provident Life and Trust Company at which this change in the stock was determined upon, it was also determined that the capital of the Company should be increased from $500,000 to $1,000,000, and that in order to raise the required amount, the privilege should be given to each stockholder of subscribing at par ($100 per share) for as many new shares as he should hold after the conversion of his old shares, provided the subscription should be made and the first instalment, $12.50 per share, paid on or before March 15th, 1882, the balance being payable in instalments of the same amount each successive quarter thereafter, the last being payable December 15th, 1883, with the privilege of anticipating payment and receiving interest at five per cent. until the time fixed as above for final payment; when fully paid shares should participate in all dividends thereafter declared. Availing herself of this privilege, testatrix subscribed for forty shares of the "new" stock, paying the first instalment, and afterwards paying the remaining instalments, in advance, June 2d, 1882, and thus becoming entitled to interest thereon until December 15th, 1883. Her death occurred August 18th, 1883.

At the audit it was claimed in behalf of The Fidelity Insurance Trust and Safe Deposit Company, trustees, that the will of the decedent "should speak and take effect as if it had been executed immediately before the death of the testator" (under the Act of June 4th, 1879, P. L., 88) and that therefore the legacy to the claimants as trustees for Joseph Ruths was of the eighty-one "new" shares owned by the decedent at that time, of the par value of $100 each. Upon this question the auditing Judge decided in his adjudication as follows (*inter alia*):—

"The object of the statute was not to affect the construction of the language of the testator so much as to prevent an intestacy as to any part of his estate. Here the question is, which of two legatees is entitled to certain shares of stock, undoubtedly passing under the will. It is a question first of

the intention of the testatrix, and second of the identity of the gift. The bequest is certainly a specific one. It is of stocks described as standing in her name. Had it been *simply* of stocks 'standing' in her name, it would, under the statute and under the authorities cited, not have been limited to stocks owned when the will was written, but would have included all stocks owned at the time of her death. But the stocks intended are specifically designated. They are described as ' *eighty-one shares* of the Provident Life and Trust Company *now* standing in my name on the books of the said Company,' expressly excluding (under the maxim *expressio unius*, etc.) such as by possibility might afterwards be acquired, and everything but those precise shares; thus bringing the case within the proviso of the statute excluding from its operation cases in which a 'contrary intention' is shown by the will, and making it clear that as to this particular gift she did *not* intend that her will should speak as of a time immediately preceding her death.

"What she gave to this legatee was the eighty-one shares of stock of the par value of fifty dollars, belonging to her at the time the will was made, the shares *then* standing in her name upon the books of the Company, and subsequently, as we have seen, consolidated or converted into half the number mentioned, but of double the par value, and, therefore, amounting in the aggregate to precisely the same sum. Nothing else was given. She certainly did not give the forty shares of the par value of one hundred dollars *not* then owned, but afterwards purchased, and which consequently, under the will, passed to the residuary legatee. It is simply a coincidence that, after the consolidation of the shares specifically given, new shares were subscribed for (although not actually acquired) making up a *number* identical with the number originally held, though of double the value. The question is not one of identity of number, but of the identity of the subject of the gift. Had the eighty-one shares standing in the name of the testatrix upon the books of the Company when the will was made remained in their original shape, and had she afterwards purchased or subscribed for eighty-one additional shares, it would not have been pretended that the latter passed to the specific legatee so as to give one hundred and sixty-two shares instead of eighty-one. How does that case differ from this?

"It seems scarcely necessary to refer to authorities in support of what is so clear upon principle; but it will be found that the authorities are in entire accord with the conclusion herein reached. Thus while in Goodlad *v.* Burnett, 1 K. & J., 341, (cited by Mr. Gest), Vice Chancellor WOOD expressed

the opinion that since the enactment of the Wills' Act it required some plainer indication of contrary intention than the mere circumstance that the testator has described stock by the words 'my stock' to take the case out of the statutory rule, that the will shall speak as if it had been executed immediately before his death, the same judge, in Douglas *v.* Douglas, Kay, 400, 405, was of opinion that a gift of 'all my stock which I *have purchased*' must be confined to stock actually purchased at the date of the will; and he proceeded to decide that in a will made since the statute, and containing the words, 'I hereby exonerate my sister from all claims in respect of money laid out by me in improvements of the estates in Scotland and which money has, according to the laws of Scotland, been charged thereon,' the exoneration only applied to moneys so charged at the date of the will, and not to money afterwards laid out and charged, nor even to money then laid out but afterwards charged. So, also, in Wait *v.* Belding, 24 Pick., 136, it was said by Shaw, C. J., that: "Should a man bequeath all his estate in the public funds, all his bank and insurance stock, and all his farming stock and utensils, it would embrace all held at the time of his decease whether held at the date of the will or acquired afterwards. But if it were 'all shares which I now own in such a bank' or 'all cattle and horses now on my farm,' it would describe specific shares and particular cattle and horses and could not extend to the others." See also, Gold *v.* Judson, 21 Conn., 616, 622, 623; Wetmore *v.* Parker, 52 N. Y. (Church, C. J.), 450, 463, 464; Quinn *v.* Hardenbrook, 54 N. Y., 83.

"A somewhat similar question arises in the construction of a will republished by a codicil, as to which the general rule is, that the effect of a codicil is to make the words of a will speak in respect to the persons and things named in it, as from the date of publication, just as though it had then been made for the first time. But as has been said, like every other general and artificial rule applied in the construction of wills it gives way before an ascertained adverse intent; and where such actual intent appears, the will and codicil will be treated as distinct instruments in order to give it effect, though in legal contemplation they are regarded as one testament: Fuller *v.* Hooper, 2 Ves., Sr., 242; Alsop's Appeal, 9 Barr, 374."

Accordingly, forty-one and a half shares of the stock were awarded to The Fidelity Insurance Trust and Safe Deposit Company, trustees, and their exceptions to above adjudication were dismissed by the court in an opinion by Hanna, P. J. Whereupon The Fidelity Insurance, Trust and Safe Deposit Company, trustees, etc., took this appeal assigning for error the decree of the court in dismissing their exceptions and in

not awarding to them the eighty-one shares of The Providence Life and Trust Company owned by the testatrix at the time of her death.

*William P. Gest* and *John Marshall Gest*, for the appellants. —At common law irrespective of the Act of June 4th, 1879, § 1, P. L., 88, a will of personalty speaks from the death of the testator, and a mere adverb etc., of present time will not restrict its language to the date of execution: 2 Redfield on Wills, § 583; All Souls' *v.* Coddrington, 1 P. Wms., 597. The question is what did the testatrix mean just before her death? Every presumption is that she did not change her will because she was satisfied with it. If she had wished to make a new will and leave to her grandson's trustees 81 "new" shares of stock she would necessarily have used the identical language of her will: but if she had wished to leave him 81 shares of the *former* par value she would have made a material change in the phraseology of her will.

The Act of June 4th, 1879, § 1, P. L., 88, is an exact copy of Stat. 7 Wm. IV., and 1 Vict., c. 26, § 24 : 8 Rev. Stat., 34. The following English cases are authorities: Hepburn *v.* Skirving, 4 Jurs. N. S., 651, (" the shares which I *now* possess in the Calcutta Bank." " The shares I *am* possessed of in the Agra Bank : ") Langdale *v.* Briggs, 3 Sm. & G., 246, (" The estate of which I *am* seised : ") Lilford *v.* Keck, 30 Beav., 300. (" lands of which I am seised : ) In re Midland R. R., 34 Beav., 525; (" The house wherein D. C. *now* resides : " In re Otley R. R. 11 Jur. N. S., 818; Miles *v.* Miles, L. R., 1 Eq., 462; Trinder *v.* Trinder, L. R., 1 Eq., 695; Wagstaff *v.* Wagstaff, L. R., 8 Eq., 229; (" property that I may *now* possess : ") York *v.* Brown, cited in L. R., 7 Ch. Div., 431; Castle *v.* Fox, L. R., 11 Eq., 542; Saxton *v.* Saxton, L. R., 13 Ch. Div., 359; Struthers *v.* Struthers, 5 W. R., 809; Russell *v.* Chell, L. R., 19 Ch. Div., 432; Bothamley *v.* Sherson, L. R., 20 Eq., 313; Everett *v.* Everett, L. R., 7 Ch. Div., 428; In re Ord, L. R., 12 Ch. Div., 22; Jopson *v.* Key, 2 H. & C., 872; Wilson *v.* Eden, 16 Beav., 155; In re Portal, L. R., 27 Ch. Div., 600. These decisions establish this rule, viz: A will speaks from the death of the testator, and adverbs or other expressions of present time are not evidence of a contrary intention, but are of themselves mere words of description.

Our Act of 1879 was passed in view of these very decisions (see debate in legislature, Legislative Record, 1879, p. 616), and our courts are therefore bound by them : McClay *v.* Benedict, 1 Rawle, 424; Stafford *v.* Wheeler, 12 Norris, 467; Brandt *v.* Commonwealth, 13 Norris, 301; Campbell *v.* Commonwealth, 3 Norris, 199; Phillips *v.* Reagan, 25 P. F. S., 383;

12 OUTERBRIDGE.—32

Zacharias *v.* Totton, 9 Norris, 290; Commonwealth *v.* Chathams, 14 Wright, 181.

A similiar question arose under the Wills Act of 1833: Roney *v.* Stilz, 5 Wharton, 381; Hackett *v.* Commonwealth, 6 Out., 514; in New York, Lent *v.* Lent, 31 Supreme Ct., 436; and in New Jersey, Garrison *v.* Garrison, 5 Dutch, 154.

If the will actually describes property owned by the decedent at her death and clearly points out the beneficiary, there is no room to doubt the testator's intention, and parol evidence should not be received to explain it: Wusthoff *v.* Dracourt, 3 Watts, 240; Appel *v.* Byers, 2 Out., 479.

*James Alcorn*, for the appellee.—This is a specific legacy: Blackstone *v.* Blackstone, 3 Watts, 335; Ludlam's Estate, 3 Clark, 275, and is still specific under the Act of 1879: Bothamley *v.* Sherson, L. R. 20 Eq., 304. The purpose of the Act is only to prevent intestacy, and the "contrary intention" "appears from the specification of the particular number of shares:" Everett *v.* Everett, L. R., 6 Ch. Div., 122; 7 Ch. Div., 428; Goodlad *v.* Burnett, 1 K. & J.; 341; Cockran *v.* Cockran, 14 Sim. 248; Douglas *v.* Douglas, Kay, 400; Cole *v.* Scott, 16 Sim., 259; 1 Hall & Twells, 477; Dickinson *v.* Dickinson, 12 Ch. D., 22. Whenever an actually existing state of facts is referred to by a testator, his will should speak as of the date of will, not of his death which is a prospective event: Gold *v.* Judson, 21 Conn., 616.

In some of the cases cited by appellant the adverb "now" is said to be a description of the subject matter, and not of the quantity of it, as In re Midland R. R. Again, subsequently acquired property necessary to the enjoyment or adjoining the original, pass by a devise of the original, as in Saxton *v.* Saxton, Miles *v.* Miles, Castle *v.* Fox, and Garrison *v.* Garrison, and the words of present time are ignored in order to prevent intestacy, as in Wagstaff *v.* Wagstaff. And in others, the description as to time and quantity is not sufficient to prevent the application of the Wills Act. These are: Trinder *v.* Trinder, Lilford *v.* Keck. The case of Saxton *v.* Saxton, L. R., 13 Ch. Div., 359, was decided under Section 23 of the Wills Act. Wilson *v.* Eden, 16 Beavan, 153, was under Section 26. Jepson *v.* Key, 2 H. & C. Rep., 872, decides that a devise to heirs after the death of the wife, gave a life estate to the wife. York *v.* Brown, is not reported, but is merely referred to by the court in Everett *v.* Everett.

Mr. Justice CLARK delivered the opinion of the court October 5th, 1885.

By the act of 4th June, 1879, sec. 1, it is provided that

"every will shall be construed with reference to the real estate and personal estate comprised in it, to speak and take effect as if it had been executed immediately before the death of the testator, unless a contrary intention shall appear by the will."

. Unless therefore a contrary intention appears by the will of Julianna B. Carman, executed 21st February, 1881, it must speak and take effect as if it had been written immediately before her death, on the 18th August, 1883; if it be read as so written the eighty-one shares of the Provident Life and Trust Company of Philadelphia, of the par value of $100 per share, at that time standing in her name on the books of the company, are clearly comprised in the terms of the bequest to the Fidelity Company. Whether a contrary intention appears by the will is, therefore, the precise question to be determined.

The general rule of the common law was, that a will of realty was construed to speak from its date; real estate which the testator did not have at the time of the making of his will, but which he subsequently acquired, would not pass under it, however express, comprehensive and general the words of the will, or however manifest the intention of the testator. A will of personalty, however, was not referable to the state of the property, at the time of the making of the will, but was construed to take effect from the date of the testator's death, unless there were expressions in the will showing it was intended to describe the property with reference to the former and not to the latter date. By sec. 10 of our act of April 10th, 1833, Purd. Dig., 1476, pl. 11, it was provided "that the real estate acquired by a testator, after making his will, shall pass by a general devise, unless a contrary intention be manifest on the face of the will." It will be seen that this section placed wills of realty and personalty on the same footing in part only, and the first section of the act of 4th June, 1879, above referred to, was enacted to complete what had only been partially effected by the act of 1833.

The bequest in the will of Julianna B. Carman is doubtless specific; it is of a particular thing, specified and separated from all other things, constituting the testatrix's estate; Walker's Estate, 3 Rawle, 229; Blackstone v. Blackstone, 3 Watts, 335; Ludlums' Estate, 3 Clark, 275; Walton v. Walton, 7 Johns. Ch., 258. If at the testatrix's death these shares had not been found the legacy would have been adeemed, and, in case of deficiency of assets, it would not have been subject to abatement with general legacies. But a specific bequest may be of a particular thing, in existence and constituting part of the estate of a testator at the time of the making of his will, or it may be of a particular thing, of which he was not then pos-

sessed, but of which he was possessed, at his death. It is sufficient if it can be specified and distinguished from the rest of the testator's estate at the time of his decease. Fontaine *v.* Tyler, 9 Price, 94; Stephenson *v.* Dowson, 3 Beav., 342; 2 Redfield on Wills, 133; and legacies which would have been specific before the statute are specific still. Bothamley *v.* Sherson, L. R., 20 Eq., 304. That the legacy is specific is not, therefore, necessarily decisive of the question under consideration. It is in the application of the rule of the statute to specific legacies that we meet with most difficulty. No case in this court has been called to our attention which involves a construction of the act of 1879, or which defines the different measure of proof, which may be required to establish a contrary intention under the statute from that which was adjudged sufficient before its passage. Roney *v.* Stiltz, 5 Wh. 381, was a decision under the act of 1833, but will be found to be in accord with the views hereinafter expressed with reference to the effect of the act of 1879.

The common law rule prevailed in England until the passage of the Wills Act of 1 Vic., c. 26 (1838), the twenty-fourth section of which is identical in form with the first section of our statute of 1879. The several adjudications, which had been made upon the former in the courts of England are important therefore, in the construction which we should put upon the latter; these adjudications may indeed be supposed to have been in the mind of the legislature when this section of the English statute was incorporated into ours.

The rule as to wills of personalty at the common law before the passage of the Wills Act was generally expressed in language not greatly different from that used in the statute, but the effect of the statute, as to personal bequests, under the construction subsequently put upon it by the courts, was to require a clearer proof, and the use of more decided terms in the will, to establish a contrary intention. Thus, where before the statute the testator had bequeathed the whole of some one genus of his property, by the description of all his property of a particular kind, as, "all debts due to me on bond," or "all my stock," or "my share," the courts had determined that he intended only so much as he had at the date of his will: Douglas *v.* Douglas, Kay, 404; but, after the passage of the Wills Act, it was held in Goodlad *v.* Burnett, 1 K. & J., 341, that the effect of that enactment was to require some plainer indication of contrary intention, and that, therefore, where a testatrix in 1850 bequeathed "my new three and a quarter per cent. annuities," the bequest comprised all at her death.

So Vice-Chancellor Stewart, in Langdale *v.* Briggs, 3 Sm. & G., 246, where the words designating the bequest were, "the

estates of which I am seised," said: " The words, no doubt, in
the ordinary sense, being wholly in the present tense, refer to
the date at which they are used.   But it is because the lan-
guage of wills is so much in the present tense, and used as
speaking at the time of the date and making of the will, that
the Act of Parliament has enlarged their interpretation beyond
the present tense, and has declared that the will is to speak as
if executed immediately before the testator's death.   Even if
the testator had said, ' I devise the lands of which I am *now*
seised,' I can find nothing in the context showing an inten-
tion contrary to the rule of the 24th section of the Act."

Referring to the several cases cited by the appellants in
support of their contention here, we find that the language by
which the bequests in each case are designated is of a generic
character, that is to say the bequests are of that which may be
increased or diminished in the life-time of the testator.   In
Hepburn *v.* Skirving, 4 Jur. N. S., 651, the bequests were of
" all the shares which I now possess in the C. bank," of "the
shares I am possessed of in the A. bank," and of "the money
I possess in the company's fund."   Afterwards the testator's
property of these kinds was much increased, and although the
words employed were in the present tense, qualified even by
the adverb "now," the will was construed as having reference
to the testator's death when the investment first became
operative : In Langdale *v.* Briggs, supra, the bequests were of
" the estates of which I am seised;" in Lilford *v.* Keck, 30
Beav., 300, " all lands of or to which I am seised or entitled in fee
simple ;" in Trinder *v.* Trinder, L. R. 1 Eq. 695, "my shares
in the Great Western Railway ;" in Wagstaff *v.* Wagstaff, L. R.,
8 Eq., 229, " all my ready money, bank and other shares, and
any other property that I may now possess;"   in York *v.*
Brown, cited in L. R., 7 Ch. Div., 431, " all his messuages,
farms, lands and hereditaments situate in the parish of Great
Bowden;" in Bothamley v.  Sherson, L. R., 20 Eq., 304, " all
my stock in the Midland Railway Company;" in Everett *v.*
Everett, L. R., 7 Ch. Div., 428, a release of all claims in
respect of certain advances made and of " all other money due
from him;" in Russell *v.* Chell, L. R., 19 Ch. Div., 432, "all
his share and interest in a certain partnership business, and of
and in the real and personal estate employed or invested there-
in, and of and in the partnership debts, securities and moneys
to which he might be entitled at his decease;" In re Ord, L.
R., 12 Ch. Div., 22, "all his leaseholds situate," &c., &c.

The several bequests in all these cases have upon the same
general ground, already stated under the Wills' Act, been con-
strued to have reference to the death of the testator.   Other
cases are cited, not strictly applicable to the question under

consideration; in some of them the qualifying word "now" serves merely as a description of the subject matter of a bequest, as In re Midland R. R., 34 Beav., 525; and in some the subsequently acquired estate was an outstanding or reversionary interest, or a renewal of a leasehold, in the property comprised in a devise, as in Saxton *v.* Saxton, L. R. 13 Ch. Div. 359; Miles *v.* Miles, L. R., 1 Eq., 462; Castle *v.* Fox, L. R., 11 Eq., 542; Garrison *v.* Garrison, 5 Dutch., 154, and Struthers *v.* Struthers, 5 W. R., 809. To all cases of this character this construction of the act has without doubt been uniformly applied; indeed it would appear that they were in the contemplation of the law-making power when the Wills Act was passed. "The applicability of the new enactment to the case of a renewed lease," says Mr. Jarman in his Treatise on Wills, page 606, "cannot be questioned, and its application has been extended to cases where, after making his will disposing of the demised property, the lessee has bought the reversion in fee; the newly-acquired interest passes by the will, notwithstanding a reference (commonly found in such cases) to the term for which the property is at the time held; this being considered only a mode of describing the property, and not as equivalent to saying, "I give my present interest and nothing else." The same principle has been applied to a devise of land. Thus in Strevens *v.* Bayley, 8 Ir. Com. Rep., L., 410; where the testatrix devised to the plaintiff "the lands of Curramore," and devised all the residue of her real estate to the defendant. The townland of Curramore had originally been held in undivided moieties, and there had been a partition under which the testatrix was, at the date of her will, entitled to one portion in severalty; and after the date of her will she purchased the other portion. It was held that the whole townland passed to the plaintiff. MONAHAN, C. J., who delivered the judgment of the court, considered that the description comprised the whole townland, and, consequently, included all in the townland of which the testatrix was seised at her death.

But the bequest in the will of Julianna B. Carman is not of the whole of any class of her property—a specific gift of an undefined amount—as of "all my shares in the Provident Life" &c., it is of "eighty-one shares," "now standing in my name on the books of the company." The words employed are used in no merely generic sense; the property is particularly specified by number and name. She had at the time of the making of her will, just that particular number of shares, and when she speaks of them as she did, she manifestly refers to an actually existing state of things; her language therefore must be taken as referential to the time of the writing of her will. The adverb "now," if used in a

[Furbush v. Greene.]

bequest of "all her shares," or "her shares standing" &c., under the authority of the cases cited, would not perhaps have been sufficient to establish any "contrary intention," as, in that connection, it would with equal propriety be referable to the date of the will or of the testatrix's decease. But when the bequest is of a certain number of actually existing shares, "*now* standing on the books of the company," we may readily conclude that the testatrix intended to limit the bequest to the identical shares she then had; if she so intended, then nothing else was given; if she referred to an existing state of things she certainly did not give the forty shares not then owned by her. It is true, that the eighty-one shares were afterwards changed to forty and one half shares, but the question is not one of identity in number, but of the identity of the subject of the gift.

The case of Cole *v.* Scott, 1 Mac. & G., 518, has been greatly relied on; in that case the gift, it is true, was of "all the estates of which I am now seised and possessed;" but the testator's meaning of the word "now" was there ascertained from the use of the same word in other parts of the will; the context clearly showing that the testator alluded to the time of the making of his will.

It is not necessary, perhaps, that this contrary intention must be expressed in so many words, but it must be clear and free from doubt, on the fair construction of the will, and it is difficult we think to conceive of a case in which that intention is more plainly expressed than here.

For the reasons stated, we are of opinion that the court was right in confirming the adjudication of the account of the executrix.

> The decree of the Orphans' Court is therefore affirmed, and the appeal dismissed at the cost of the appellant.

MERCUR C. J., and GORDON J. dissent.